J-S62037-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: P.A.R. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.C., BIOLOGICAL MOTHER | : | No. 779 WDA 2015 |

Appeal from the Order March 31, 2015
In the Court of Common Pleas of McKean County
Orphans' Court at No(s): 42-14-0221

| | | |
|---|---|---|
| IN RE: X.J.R. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.C., BIOLOGICAL MOTHER | : | No. 780 WDA 2015 |

Appeal from the Order March 31, 2015
In the Court of Common Pleas of McKean County
Orphans' Court at No(s): 42-14-0221-1

BEFORE: GANTMAN, P.J., JENKINS, J., and PLATT, J.*

MEMORANDUM BY GANTMAN, P.J.: **FILED NOVEMBER 24, 2015**

Appellant, A.C. ("Mother"), appeals from the orders entered in the McKean County Court of Common Pleas, which granted the petitions of McKean County Children and Youth Services ("CYS"), for involuntary termination of Mother's parental rights as to her twin minor children, P.A.R. and X.J.R. ("Children"). We affirm.

The relevant facts and procedural history of this case are as follows. Children were born in January 2014. On February 1, 2014, Father placed X.J.R. in scalding hot water in an attempt to bathe him, which caused X.J.R.

_____

*Retired Senior Judge assigned to the Superior Court.

to suffer burns to his hands and feet. At the time, Father was under the influence of marijuana, and Mother was recovering from an infection sustained during her cesarean section. Father claimed he filled a container with water, placed it on the changing table next to X.J.R., stepped away for a moment, and upon his return, saw that X.J.R. was wet, crying, and had burns on his hands and feet. Police investigated the incident and discovered drugs and drug paraphernalia in Mother and Father's home. The condition of the home was also in complete disarray, as there were clothes and baby items scattered throughout the home and on the floor, drug paraphernalia out in the open, a cockroach infestation, and dirty dishes scattered everywhere.

CYS filed petitions for emergency custody of Children on February 3, 2014, which the court granted following a hearing on February 5, 2014. Thereafter, CYS filed dependency petitions for Children on February 12, 2014. After a two-day hearing on the petitions, as well as the Master's recommendation that Children be found dependent, the court deemed Children dependent on April 9, 2014. On October 16, 2014, CYS filed petitions for involuntary termination of Mother and Father's parental rights. The court held termination proceedings on January 14, 2015 and January 27, 2015. The court granted CYS' petitions on March 31, 2015, and involuntarily terminated Mother and Father's parental rights to Children. On April 27, 2015, Mother timely filed notices of appeal at both docket numbers,

as well as concise statements of errors complained of on appeal pursuant to

Pa.R.A.P. 1925(a)(2)(i).[1]    This Court subsequently consolidated Mother's

appeals.

Mother raises the following issues for our review:

> WHETHER THE TRIAL COURT ERRED IN REFUSING TO
> ENTERTAIN BIOLOGICAL MOTHER'S MOTION FOR A
> COMPULSORY NONSUIT AT THE CLOSE OF [CYS'] CASE,
> WITH RESPECT TO [CYS'] CLAIM UNDER 23 PA.C.S. §
> 2511(A)(5) AND 23 PA.C.S. § 2511(A)(1)[.]
>
> WHETHER THE TRIAL COURT'S REFUSAL TO RULE ON
> BIOLOGICAL MOTHER'S MOTION FOR A COMPULSORY
> NONSUIT PREJUDICED BIOLOGICAL MOTHER BY
> IMPROPERLY SHIFTING THE BURDEN OF PROOF AT
> TRIAL[.]
>
> WHETHER THE TRIAL COURT ERRED IN FINDING THAT
> THE EVIDENCE ADMITTED AT TRIAL WAS SUFFICIENT TO
> SUPPORT AN INVOLUNTARY TERMINATION OF PARENTAL
> RIGHTS[.]

(Mother's Brief at 3-4).

Appellate review in termination of parental rights cases implicates the

following principles:

> In cases involving termination of parental rights: "our
> standard of review is limited to determining whether the
> order of the trial court is supported by competent
> evidence, and whether the trial court gave adequate
> consideration to the effect of such a decree on the welfare
> of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972

A.2d 5, 8 (Pa.Super. 2009)).

---

[1] Father is not a party to this appeal.

Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).

Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

*In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191[-92] (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

In issues one and two combined, Mother argues her motion for a compulsory nonsuit should have been granted, and she was prejudiced by

the court's refusal to rule on her motion. Specifically, Mother contends CYS' petitions for involuntary termination of her parental rights failed to establish a right to relief under 23 Pa.C.S.A. § 2511(a)(1) and (a)(5). Mother alleges the court failed to identify what conditions led to the removal of Children and whether those conditions were alleviated. Mother claims the evidence introduced pursuant to Section 2511(a)(5) showed the conditions which led to the removal of Children had been alleviated in less than two months after CYS filed the dependency petitions. Mother also complains the evidence introduced in support of Section 2511(a)(1) did not establish that she failed to perform her parental duties for a continuous six months prior to CYS' filing the termination petitions. Mother insists the court failed to identify when Mother's cooperation with the reunification plan began to decline. Mother further asserts the evidence did not prove she had a settled plan to relinquish her parental rights or refused to perform her parental duties. Mother maintains the court erred in not granting her motion for a compulsory nonsuit. Mother concludes this Court should vacate and remand for a new hearing on only the grounds for which CYS established a right to relief.

Mother also argues the court's refusal to rule on her motion for a compulsory nonsuit prejudiced her because it caused the burden of proof to be improperly shifted to Mother. Mother claims her presentation of evidence would have significantly changed if the court had granted her motion.

Mother asserts the court's failure to decide her motion forced her to introduce evidence she otherwise would not have introduced only to disprove CYS' Section 2511(a)(1) and (a)(5) claims. Mother maintains her defense to CYS' Section 2511(a)(2) claim was prejudiced. Mother concludes this Court should vacate and remand for a new hearing. We disagree with Mother's contentions.

"'[T]he trial court, on the oral motion of a party, may enter a nonsuit if the plaintiff has failed to establish a right to relief.'" ***In re Estate of Boardman***, 80 A.3d 820, 822 (Pa.Super. 2013) (quoting ***Keffer v. Bob Nolan's Auto Service, Inc.***, 59 A.3d 621, 631 (Pa.Super. 2012). ***See*** Pa.R.C.P. 230.1(a)(1). "[C]ompulsory nonsuit may be entered only in cases where it is clear that the plaintiff has not established a cause of action…. When so viewed, a non-suit is properly entered if the plaintiff has not introduced sufficient evidence to establish the necessary elements to maintain a cause of action." ***Id.*** (quotation marks omitted). "The court in deciding the motion shall consider only evidence which was introduced by the plaintiff and any evidence favorable to the plaintiff introduced by the defendant prior to the close of the plaintiff's case." Pa.R.C.P. 230.1(a)(2).

Moreover, regarding involuntary termination of parental rights, the Pennsylvania Consolidated Statutes provide, in relevant part:

**§ 2511. Grounds for involuntary termination**

**(a)    General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the

following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

(5)  The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

**(b)    Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1)…the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511 (a)(1), (5); (b).  "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." ***In re Z.P., supra*** at 1117.

- 7 -

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of…her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

Termination under Section 2511(a)(1) involves the following:

> To satisfy the requirements of [S]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,
>
> > Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child **and** refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child **or** fails to perform parental duties.
>
> Once the evidence establishes a failure to perform parental duties **or** a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for…her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal emphasis added). Regarding the six-month period prior to filing the termination petition:

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of…her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004). Furthermore, "[t]ermination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Z.P., supra* at 1118.

Under Section 2511(b), the court must consider "whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re T.D.*, 949 A.2d 910, 920 (Pa.Super. 2008). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child." *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re Z.P., supra* at 1121. "It is universally agreed that the bond of parental affection is unique and irreplaceable." *In re Diaz*, 669 A.2d 372, 377 (Pa.Super. 1995).

> When parents act in accordance with the natural bonds of parental affection, preservation of the parent-child bond is **prima facie** in the best interest of the child, and the state has no justification to terminate that bond. On the other hand, a court may properly terminate parental bonds which exist **in form** but not **in substance** when preservation of the parental bond would consign a child to an indefinite, unhappy, and unstable future devoid of the irreducible minimum parental care to which that child is entitled.

*Id.* (quoting **In re J.W., supra** at 958) (emphasis in original).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and may properly have…her rights terminated." **In re B.L.L.**, 787 A.2d 1007, 1013 (Pa.Super. 2001). This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert [herself] to take and maintain a place of importance in the child's life.

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of…her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.

*In re B.,N.M., supra* (internal citations and quotation marks omitted). "[A] parent's basic constitutional right to the custody and rearing of…her child is converted, upon the failure to fulfill…her parental duties, to the child's right to have proper parenting and fulfillment of…her potential in a permanent, healthy, safe environment." *Id.* at 856.

Instantly, Mother moved for a compulsory nonsuit at the conclusion of CYS' case during the termination proceedings. The court failed to rule formally on Mother's motion, which it acknowledged in its Rule 1925(a) opinion. The court concluded, however, that this error was harmless and did not prejudice Mother, as CYS had presented sufficient evidence for involuntary termination of Mother's parental rights. In its Rule 1925(a) opinion, the court discussed its findings as follows:

> [W]ithout considering the evidence present by Mother[,] there was sufficient evidence for [CYS] to establish a cause of action. [CYS] presented evidence to establish that Mother initially[,] and at least to some extent[,] cooperated with reunification efforts. She initially attended visits and participated in several programs to attempt to

- 11 -

address her mental health and drug and alcohol concerns. However, this initial cooperation waned and very serious concerns regarding her attitude and motivation thereafter resurfaced and remained. [CYS] witnesses testified that Mother was consistently detached from [C]hildren during visits; and, she failed to grasp understanding and comprehension of necessary and common sense parenting skills and responsibilities. She was…given the opportunity to address her personal and parenting concerns and she has failed to do so. [CYS] demonstrated that there was a repeated pattern of Mother failing to follow through with services and requirements and attempting to cover this failure by blaming either the providers of services or those asking her to complete tasks for her lack of action. She refused to continue to attend Alcoholics Anonymous and Narcotics Anonymous meetings because she asserted that there might be individuals at those meetings who would harm her or her children. She did not complete counseling as ordered because she [did not] like the counselor she was seeing. She [did not] complete her mental health counseling with Christopher Anderson at the Bradford Regional Medical Center because [Mother did not] feel it was helpful. She [did not] take her medication for her seizure disorder and mental health care because she [did not] like the side effects and asserted she [could not] afford them even though caseworker Braeger indicated that [Mother] could obtain prescription assistance if she contacted the American Red Cross and/or Destinations Bradford.

[CYS] also demonstrated that there was an unproductive pattern regarding visits. Mother attended some but missed a substantial amount of the scheduled visits. When she was asked to help with the scheduling of the visits she refused to even provide her work schedule. During the visits[,] Mother's care of [C]hildren was questionable. She did not understand how to interact and take care of them. She zoned out and looked at her phone. When caseworkers and other service providers attempted to teach Mother to be more attentive and recognize [C]hildren's cues, Mother was often very defiant and, again, "she would argue until she was blue in the face."

\* \* \*

> Therefore, since [CYS] presented sufficient evidence to demonstrate that nonsuit was not appropriate, the court's failure to rule on that Motion at the time it was made was harmless error and Mother, therefore, is not entitled to relief on appeal.

(Rule 1925(a) Opinion, filed July 1, 2015, at 2-4). We accept the court's conclusions. CYS presented sufficient evidence to support the involuntary termination of Mother's parental rights under Section 2511(a)(1) and (a)(5). **See** 23 Pa.C.S.A. § 2511(a)(1), (5). Thus, Mother suffered no prejudice from the court's failure to rule on her motion, as competent evidence supported CYS' claims for relief. Likewise, Mother suffered no improper burden shifting at the termination proceedings. **See In re Z.P., supra** at 1115-16; **In re Estate of Boardman, supra**. Accordingly, Mother's first and second issues merit no relief.

With regard to Mother's third issue, claiming sufficiency of the evidence, after a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinions of the Honorable John H. Pavlock, we conclude issue three merits no relief. The court's opinions comprehensively discuss and properly dispose of the question presented. (**See** Trial Court Opinion for X.J.R., filed March 31, 2015 at 8-11, 17-19; Trial Court Opinion for P.A.R., filed March 31, 2015, at 8-11, 17-19) (finding: Mother made initial efforts to cooperate with caseworker and comply with reunification plan by attending visits with Children, attending medical appointments, and participating in several programs to address Mother's

mental health and drug and alcohol problems; nevertheless, Mother remains detached from Children during visits, lacks adequate understanding of parenting responsibilities, has failed to address personal and parenting concerns despite being given multiple opportunities, has pattern of failing to follow through with services and requirements, blames service providers for failing to help her complete tasks, has failed to attend Alcoholics Anonymous, Narcotics Anonymous, and counseling, and has failed to take medication for seizure disorder and mental health issues; Mother has failed to maintain consistent contact with caseworker, and has missed substantial amount of scheduled visits with Children; Mother has repeatedly notified CYS last minute that she would be unable to attend visits because of work, but refuses to provide CYS with her work schedule to facilitate scheduling visits with Children; Children lack strong bond with or recognition of Mother due to her lack of contact with them; Mother's interactions with Children are "forced" and "strained" because of her lack of emotional attachment to Children; Mother has extreme difficulty meeting Children's basic needs during visits, such as feeding them; Mother's current apartment is not furnished in condition suitable for Children; CYS demonstrated, through clear and convincing evidence, competent grounds to terminate Mother's parental rights to Children under Sections 2511(a)(1) and (a)(5)). The record supports the court's decision; therefore, we see no reason to disturb it. As for Mother's sufficiency of the evidence issue, we affirm on the basis of the

court's opinions. Accordingly, we affirm the involuntary termination of Mother's parental rights to Children.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/24/2015

IN THE INTEREST OF:

ADOPTION OF:

IN RE: P.A.R.

IN THE COURT OF COMMON PLEAS OF

McKEAN COUNTY, PENNSYLVANIA

ORPHAN'S COURT DIVISION

NO. 42-14-0221

### MEMORANDUM AND ORDER

P.A.R. is one (1) year old and has a Date of Birth of

Preston's natural Father is H.R. (hereinafter "Father"); and, his natural Mother is A.C. (hereinafter "Mother"). McKean County Children and Youth Services (hereinafter the "Agency") filed a Petition to Involuntarily Terminate Mother's and Father's Parental Rights and hearing has been held. The matter is now ready for a decision.

### FINDINGS OF FACT:

P.A.R. has been in placement since February 3, 2014. The court has issued findings regarding the dependency proceedings and those findings are incorporated herein and set forth as follows:

### APRIL 8, 2014, FINDINGS AND ORDER:

#### FINDINGS OF FACT

Findings of fact are as follows Mother and her counsel stipulate that the child was dependent at the time the Agency filed the within Petition. Father and his counsel stipulate that Father is incarcerated and is likely to remain incarcerated such that Father is not available to care for the child, and therefore, child is dependent The Agency requested and counsel to the parents did not oppose the record remaining open as to the issue of dependency such that the Agency could provide additional testimony in the future should it deem such testimony necessary The Agency. Mother and her counsel propose and the Master accepts a disposition such that the child shall remain placed in

1

foster care and Mother shall continue to have routine visits with the child For a two week period, Mother shall have unsupervised visits with the child per a schedule promulgated by the Agency with the Agency conducting unannounced pop-ins during these visits. If the unsupervised visits go well, Mother shall thereafter be afforded overnight visits If the overnight visits go well for a period of two week or more, the Agency will agree to return the child to Mother's care However. Mather is responsible for creating an appropriate child care plan for periods when she is unavailable to care for the child due to work (or any other reason) All caregivers will have to be approved by the Agency Mother must continue to comply with recommended drug and alcohol treatment, as well as recommended mental health treatment, including taking all prescnbed medications in accordance with the prescriptions.

THE COURT FURTHER ORDERS: The child shall remain placed in foster care in the Morrisroe home and Mother shall continue to have routine visits with the child. For a two week period, Mother shall have unsupervised visits with the child per a schedule promulgated by the Agency with the Agency conducting unannounced pop-ins during these visits. If the unsupervised visits go well, Mother shall thereafter be afforded overnight visits. If the overnight visits go well for a period of two weeks or more, the Agency will agree to return the child to Mother's care. However, Mother is responsible for creating an appropriate child care plan for periods when she is unavailable to care for the child due to work (or any other reason) AN caregivers will have to be approved by the Agency Mother must continue to comply with recommended drug and alcohol treatment, as well as recommended mental health treatment, including taking all prescribed medications in accordance with the prescriptions. Both parents shall continue to comply with the Family Service Plan promulgated by the Agency. The record shall remain open as to further reasons for dependency and the Agency shall be permitted to offer additional testimony if such testimony would become necessary it the future
The matter shall be reviewed in one month.

## MAY 6, 2014, FINDINGS AND ORDER:

THE COURT FURTHER FINDS: Counsel stipulates that the sections of the DCRF for this matter containing the information regarding what was ordered to be done at the last hearing and what was done since the last hearing may be admitted into evidence and made a part of the record in this case. The mother was evicted from her last residence and is no longer residing with her boyfriend. Mother is now living with her sister in an apartment

2

that Mother acknowledges is only appropriate for a temporary period as it is too small to accommodate the child and his twin. Mother is making efforts to find appropriate housing. Mother has not been availing herself of all opportunities for visits with the child and his twin. The mother was not taking seizure medication as prescribed, but she is now involved in treatment again and appears to be taking her seizure medication as prescribed. Mother indicates that her counselor through the 1OP Program is recommending that she attend ANNA meetings upon discharge from lOP; however, Mother is not comfortable with attending AA/NA meeting and believes it will affect her sobriety if she is forced to attend such meetings. Mother's counsel believes that the recommendation for AA/NA is standard and is not tailored to Mother specifically. Father remains incarcerated and is involved in programming and counseling at the jail. He is disputing the underlying charges which relate to the child and his sibling. The counselor at the jail has apparently indicated that visits with the Father and the child would not be appropriate at this time and the Father may still have bail conditions which would prevent this. The Agency has not been providing Father with much information about the children due to his charges and incarceration.

THE COURT FURTHER ORDERS: The child shall continue to have supervised visits with the Mother per a schedule established by the Agency; however, the Agency shall increase duration and frequency of such visits and only the Mother shall be present for the visits with the supervising CYS representative. Mother shall call for updates during the week from the foster family. The Agency and Mother's counsel shall find out from Mr. Anderson , Director of the !OP Program, if he will agree to Mother having scheduled weekly visits with him in lieu of attending ANNA meetings. Mother shall attend all visits/appointments for the children. The matter shall be reviewed in two months. Mother shall continue her efforts to find appropriate housing and she shall continue to take all medication as prescribed. The Mother shall continue to submit to random drug testing. The Agency shall provide the Father, biweekly written updates on children and their status

## JULY 1, 2014, FINDINGS AND ORDER:

COURT FURTHER FINDS: The foster mother indicates that it isn't her responsibility to contact the Mother and that she would prefer that mother receive information through CYS, although she

would communicate with Mother if Ordered to do so. The Mother complains that the foster parents are not calling her back when she leaves messages and that communication with the foster family is difficult. It is apparent that there is a communication breakdown between the Mother and the foster family and that lack of communication may hinder the reunification process if it cannot be remedied. The Mother has been attempting to obtain housing and is working with Tracy Fowler for mental health. The Mother has been referred to blended case management, but has not heard from them. The Mother admittedly did not have a telephone for a period of time so she could not call for updates on the child. She is now working part-time and her schedule normally has her working during the allowed timeframe for her to call the foster home. The Father remains incarcerated and is working on programming while at the jail.

THE COURT **FURTHER** ORDERS: The Mother's request to modify placement is denied at this time; however, she may renew said request if the communication with the foster home does not improve. The Agency shall continue to afford the Mother visit and the Agency shall have the discretion to adjust the location, type and frequency of visits; however, the Mother shall not be granted less than her current visit schedule. The Mother shall call the foster home up to three times per week for updates on the child and may call additionally in the event of an emergency. The Morrisroes shall call the Mother back if she is unable to reach them when she calls. If the Mother's phone is inoperable, she shall notify the Agency/Caseworker immediately. The Mother shall schedule any necessary appointments for the child and shall attend all such visits. The Agency shall continue to provide Father bi-weekly updates on the child's progress and shall hand deliver such updates to the jail. The Mother shall continue to comply with all recommended mental health services and shall maintain her employment. The Mother shall continue her efforts to locate appropriate housing. The Mother shall maintain her sobriety and shall be subjected to random drug screens by the Agency.

The matter shall be reviewed in one month

## AUGUST 5, 2014, FINDINGS AND ORDER:

THE COURT FURTHER FINDS: The Agency requested that the DCRF and both addendums thereto be admitted into evidence;

4

both parents' attorneys objected to certain information in the materials; therefore, the court will accept the DCRF and Addendums into evidence with several caveats: (1) any mention of a positive meth test for the mother shall be stricken, (2) the fact that mother was requested to supply medication information and failed to do so shall remain, (3) the reference to mother applying to social security in the second addendum shall be deleted and replaced with her applying for CHIP, (4) the letters from the paternal grandmother shall be stricken and not considered as she is not a party to the case, and (5) mention of father's criminal charges relating to the child shall be stricken, but it will remain noted that he remains incarcerated. The child has done well in the foster home. The Mother has only called the foster home 55% of the available times. Mother had not contacted the foster home from July 26 to August 4. Mother is currently not taking any of her prescribed medications nor is she following through with services. Father requests that the paternal grandfather be considered for kinship care.

THE COURT FURTHER ORDERS: The Agency shall continue to afford mother supervised visits per the previously set schedule. The Mother must confirm the day before the visit as she has been. The Mother is to follow through with all medications and recommended services and procuring insurance. Mother to continue to contact foster home per previous schedule . If the Mother fails to confirm a visit or confirms but fails to be available/show up for two visits, then the Agency shall request an immediate hearing to discuss reducing the visitation schedule. The mother shall attend all appointments for the child. The Agency to follow through with checking out the kinship request of  H . R .

## OCTOBER 7, 2014, FINDINGS AND ORDER:

The Agency is recommending that Mother's and Father's parental rights be terminated and that the children be adopted.  Attorney Alfieri-Causer stated that the termination petition would be filed in the near future.  If the Petition is denied then the court would immediately schedule a further permanency review hearing and set in place a revised reunification plan. If the petition is granted then the court would direct the Agency to assure that the adoption proceeds in a timely manner.  Since it is unknown at this point what the outcome will be the Court is directing the Agency to file the termination petition within the next ten (10) days and directing the

deputy court administrator to schedule a hearing on the termination petitions as soon as the Court's schedule allows.

**<u>ADDITIONAL ORDER:</u>**
The Agency shall file their Petitions to Terminate Parental Rights within the next ten (10) days. The Deputy Court Administrator shall schedule hearing on the termination petitions as soon as the Court's schedule allows. Review hearing in this matter shall be held in approximately sixty (60) days.

Based on the testimony and exhibits presented at the time of the termination hearings, the court also finds as follows:

Father has an extensive criminal history and has been sentenced to a lengthy period of incarceration. Specifically, on or about August 21, 2014, Father, H.R. was sentenced at Nos. 314, 315, 316, and 317 CR 2014 for four separate incidents of arson all of which were Felonies in the first degree. The aggregate sentence imposed at those captions was not less than eight-four (84) months nor more than two hundred forty (240) months with credit for time served of one hundred eighty-four (184) days. In addition, on or about August 26, 2014 at No. 156 CR 2014, Father was convicted in a jury trial of Possession with Intent to Deliver a Controlled Substance, a Felony; Endangering the Welfare of a Child, (F-3); Recklessly Endangering Another Person, (M-2); Possession of Small Amount of Marijuana (M); and Simple Assault (M-2). He was sentenced to a total of not less than eighteen (18) nor more than fifty-two (52) months consecutive to all other case numbers. These convictions were as a result of conduct involving P. A.R.'s twin, X.J.R. On February 1, 2014, Father had placed X.J.R. who was only several weeks old at the time, into scolding hot water. X.J. R suffered burns to his hands and feet. Father told a CYS investigator that he had "smoked a half joint" just prior to bathing X.J.R.

Father's explanation for how X.J.R. was burned was completely incredible. He explained that he had filled a Tupperware container with water, placed it and X.J.R. on the changing table and "went to talk to my old lady,"

6

and when he came back the child was wet and crying and he noticed burns. However, since the burns were on the hands and feet and X.J.R. was so young, it would be impossible for this infant child to place his hands and feet in hot, scolding water.

When the police investigated the burn incident they also discovered drugs and drug paraphernalia in the Parent's home. The evidence demonstrated that Father was smoking marijuana the day that P.A.R.'s twin was injured. Mother was recovering from giving birth to the twins on the day that P.A.R.'s twin was injured by Father. However, Mother was also aware that there were narcotics in the home and that Father was smoking marijuana and she still allowed him to provide care for X.J.R. Father's aggregate period of incarceration on both criminal cases is not less than one hundred two (102) months nor more than two hundred ninety two (292) months (8 ½ to 24.3 years).

Father had an extensive psychiatric history prior to February 1, 2014, and had been prescribed medication. Father indicated that he has had "blackouts" in the past. He was not following his treatment plan and taking his medication in February 2014. He advised a CYS interviewer that he wasn't taking his medication because he felt marijuana use was "safer" than his psychiatric medications. Mother was aware that Father had a mental health history and was not taking his medication and she still allowed him to provide care for P.A.R. and X.J.R.

The condition of parent's home on February 1, 2014, was that of complete disarray. There were clothes strewn on the floor and throughout the home, baby items scattered throughout the home, drug paraphernalia out in the open, a cockroach infestation and dirty dishes scattered everywhere. Mother did have a wound from the cesarean section that she had undergone and she was suffering from an infection. Therefore, her ability to maintain the home was limited. However, it was also evident that the home had been in an unsanitary condition for some time. There was no testimony that Mother had recognized the home

7

was unsafe for the children to be in and that she had reached out for assistance. Mother also admitted that she was also smoking marijuana while she was pregnant and residing with Father. Therefore, it is clear that the drug use and the condition of the home wasn't just something that happened when P.A.R. and X.J.R. were born; this was something that had built up over a long period of time. The children were placed in foster care.

Mother initially cooperated with her caseworker and followed the reunification plan. She attended visits and interacted with P.A.R. and X.J.R. She also attended medical appointments. Mother had admitted to her own previous marijuana use but she had obtained a drug and alcohol evaluation and was following her drug and alcohol treatment plan. However, Mother immediately had issues regarding housing. She vacated the home that she and Father had been residing, stayed with friends for some time and was homeless for a period of time.

Mother's initial cooperation with the Agency and progress waned. She refused to continue to attend Alcoholics Anonymous and Narcotics Anonymous meetings because she believed that it would endanger her and her children's lives. However, the court finds no merit to this accretion and the court finds that Mother was inappropriately attempting to use this as an excuse. This bizarre explanation also reflects a pattern that Mother has of attempting to turn positive suggestions into a negative in order to justify her inaction or her opinion – and, as one of her caseworkers described it, "arguing until she is blue in the face." Mother agrees that she did not work well with her initial counselor because she "felt like she didn't listen to me;" and, "because I didn't like her I didn't go (to counseling)." Her case was closed out due to lack of contact. She now has a counselor that she feels listens to her and she has been attending her appointments regularly.

Mother also failed to follow through with her mental health treatment plan. She was seeing Christopher Anderson at the Bradford Regional Medical

8

Center. She was involved in the intensive outpatient program. He prepared an assessment for Mother in March of 2014 and recommended that Mother attend both individual and group therapy sessions. The court accepts his testimony that Mother's sessions had to be "dragged out because she kept missing appointments."[1] Mother was eventually discharged from the program due to noncompliance.

Mother began missing visits and failed to maintain consistent contact with her caseworker. Due to the lack of contact with her P.A.R. and X.J.R. did not have a strong bond or recognition of Mother and the visits were described as "forced" and "strained." Also, Mother had difficulty emotionally attaching with the boys. She did not understand how to interact with them. If the children were fussy Mother didn't recognize it and did not respond to them. One caseworker describing visits at Mother's apartment stated that "she (Mother) put a movie in and then kind of zoned out on the bed." When caseworkers and other service providers attempted to teach Mother to be more attentive and recognize the children's cues, Mother was often very defiant. Again, a caseworker described it as "she would argue until she was blue in the face." Mother has been referred to services to assist her with development of her parenting abilities. She has participated with some of these services but declined others.

One clear example of Mother's inability to focus on the needs of the children is her frequent use of her cellphone during visits. She won't put it down and is "constantly texting or talking on the phone." These have not been emergency calls. The Court finds that Mother reaches for her phone because she literally can't get into the children's world and she wants to stay in hers – that using her phone is a way to stay in the bubble of her world even when she is with the children.

There were also legitimate concerns regarding Mother leaving the twins in their care seats during visits and not removing their coats, etc. Mother admitted

---

[1] All of the quotes in this opinion are from the court's notes.

that she had done this but asserted that it was appropriate to leave the children strapped in their car seats because it was easier to feed them. She asserted that she is trying to address the Agency's concerns about this. Caseworker Wolfel testified that Mother had extreme difficulty meeting the children's needs during visits. She described one visit where both boys wanted fed and Mother would give them a little to eat, then take the bottle away which would result in that child crying hysterically, she would go to the other child and give him an ounce or two, then back to the other. This resulted in both children crying hysterically and, as caseworker Wolfel described it, "it was not very nice to see." Caseworker Wolfel also testified that Mother was often not ready for visits: "many times we showed up and she was not up."

Mother indicated during her testimony that she understands that she may appear to be not nurturing. She indicated that "it's because of my childhood. I was molested, beat." She explained that she "went from place to place to place as a ward of the state. I didn't know what baby talk is." However, she believed that she could learn to be more nurturing if someone taught it to her.

A clear example of Mother's defiance is her refusal to provide her work schedule to her caseworker and attempt to alter her work schedule so that she could attend visits. Mother works and McDonalds and has been asked to provide her work schedule or change her schedule so that her work does not interfere with her scheduled visits. She has repeatedly failed to provide her work schedule to her caseworker in advance and has repeatedly called at the last minute to advise the Agency that visits would have to be changed due to her work. Mother testified that she didn't understand why her caseworker was asking for her work schedule, "I didn't see the relevance." Another example is Mother's request to have the children removed from the Morrisroe foster home because: "she (Mrs. Morrisroe) was giving me attitude." Mother was also asked to bring toys and other items for visits. She did not dispute that at times she

10

failed to do this but asserted that there are toys at the CYS offices and "why lug three bags."

Mother does have a current apartment that she and her current boyfriend have kept relatively neat and organized (her boyfriend, A. H., testified that he does a majority of the housework as he is unemployed). However, this apartment is above a bar/restaurant in downtown Bradford, Pennsylvania and it is relatively small. Mother does not have it furnished in a condition that is suitable for the children. Mother's current boyfriend and her 3 year old son are also residing there.

Mother's current boyfriend, A. H., is unemployed. He testified that he has 4 children of his own and the youngest is 9 months old. His two youngest children visit him every other weekend. He has not had any contact with the two older children for years and "my parental rights for my middle child were given up." He testified that he has a medical condition and is "very hard of hearing." He testified, and Mother confirmed, that Mother is suffering from seizures. He explained that "her whole body actually shakes and she can have slight confusion." Mother will shake for 2 or 3 minutes and lose focus and that this happens "1 or 1 ½ times a month." He explained that he is going to stay with Mother and he recognizes when these seizures are coming on. He explained that he does all of the cleaning in the home.

Mother testified that her seizure condition excludes her from obtaining a driver's license. She indicated that her "seizure disorder" started in January of 2012. She believes that she has a "disc that is putting pressure on my brain. About 50% chance that is the cause." When caseworker Stacey Wolfel discovered that Mother was having seizures she had Mother show her all of her prescriptions. It was evident that Mother was not taking her medications and was not attending her mental health appointments. Caseworker Jonathan Braeger testified that Mother also told him that she wasn't taking her seizure and mental health medications. He said that she indicated that she did not like the

11

side effects of her medication and she could not afford them. He told her that she could obtain medication assistance from the American Red Cross and the Destinations Bradford program. However, Mother refused to follow through. Caseworker Braeger repeated a familiar theme: "most of the time we had animosity from her. Very argumentative. She would say that we were wrong."

No medical testimony was presented regarding Mother's seizures or their cause. The court does not accept Mother's assertions that a disc is pushing on her brain; and, even if the court were to accept this assertion, it raises way more serious concerns about Mother's ability to provide future care than is answers. Therefore, a very significant issue remains regarding whether these seizures will stabilize or become worse.

Mother has a pattern of not taking her seizure and mental health medications. Of course, her conditions and symptoms are exasperated if she doesn't take her medication. Since the children would be at serious risk if Mother had a seizure while they were in her care, this raises very serious safety concerns.

P. A. R. and X.J.R. remain in the Morrisroe foster home. Dawn Morrisroe testified that she has been a foster parent for 12 years prior to February 2014. She was initially reluctant to accept further foster children when the Agency contacted her in February 2014. However, since the Agency was having difficulty obtaining an appropriate foster home for P.A.R. she agreed to accept him on a short term basis. Then, when she was told that the Agency was having a hard time finding a foster family willing to accept X .J.R. , she agreed to accept him as well. She also did not want these twin boys to be separated. It has been demanding to provide care for the twins but she has become very bonded to them and they are very bonded with her and her family. She has attended the majority of their medical appointments and is working with service providers regarding the children's needs.

12

Mrs. Morrisroe initially agreed to provide care for the twins because she believed that Mother had indicated a desire to work with her, the Agency and service providers to have the children returned to her care. However, after initial progress Mrs. Morrisroe became frustrated with Mother's lack of progress and initiative. Doctor's appointments were scheduled only to be cancelled, at the doctor's office, when Mother failed to show up. She would make suggestions to Mother about providing care, such as not to put cereal in the children's bottles as they were too young for it and it was not recommended by their doctor, and Mother would not only ignore her but defiantly argue with her. After the children were in placement for about 6 months Mother became very frustrated with Mrs. Morrisroe and Mrs. Morrisroe became very frustrated with Mother. Mother then, instead of focusing on improving her parental skills, focused on constantly questioning Mrs. Morrisroe's care for the boys and asserting that both Mrs. Morrisroe and the Agency were in a conspiracy against her.

P. A. R. and X. J. R. are extremely bonded to Mrs. Morrisroe. She indicated that she will adopt both of them if that is an option, even if her husband is unwilling to do so. She explained that her husband is close to the boys and provides care for them but he is not certain that he wants to take on full parental responsibilities for them. Mrs. Morrisroe testified that, even if her husband is unwilling to adopt P. A. R. and X. J. R. she will. She very bluntly indicated that her desire to care for P. A. R. and X. J. R. will trump all other responsibilities and interests in her life.

## AUTHORITY:

The Agency asserts that the following statutory requirements for termination of parental rights have been demonstrated in this case:

**(a) General rule.** -- The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

---

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. §2511(a)(1),(2) and (5).

The grounds for terminating parental rights under Section 2511(a)(2) are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. In re A.L.D., 797 A.2d 326, 337 (Pa.Super. 2002). Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. Id. at 340.

In In re Geiger, 459 Pa. 636, 331 A.2d 172 (1975), our Supreme Court first announced the fundamental test in terminating parental rights

14

pursuant to section 2511(a)(2). According to Geiger, three things must be shown before a natural parent's rights in a child will be terminated: (1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. Id. at 173-174.

In Re R.H., 33 A.2d 95, 100 (Pa.Super. 2011). In R.H. the Superior Court focused on the following factors when it upheld the trial court's termination of parental rights: parent was "minimally compliant" but she still failed to grasp and implement proper parenting skills; she was argumentative with service providers and her caseworkers; and, her participation was consistently "erratic" and without reasonable prospect of change. Id. at 102-103.

When addressing a request to terminate parental rights the Court is required to "[g]ive primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.C. §2511(b). Further, "[t]he rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. Id.

An inquiry into whether termination of parental rights would best serve the developmental, physical and emotional needs and welfare of the child is a distinct aspect of a termination hearing, to be undertaken only after the statutory requirements of section 2511(a) have been met. Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of a child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect

15

on the child of permanently severing the bond. In re C.P., 901 A.2d 516, 520 (Pa.Super. 2006), as cited by, In re K.C.F., 928 A.2d 1046, 1049 (Pa.Super. 2007).

The burden of proof upon a petitioner in a termination proceeding is by clear and convincing evidence:

> In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking termination of parental rights are valid. . . . The standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'

In the Interest of A.S., 11 A.3d 473, 477 (2010)(citations omitted).

When reviewing the evidence the Court, as the trier of fact, "is likewise free to make all credibility determinations and resolve conflicts in the evidence." Id.

A parent's right to the custody of his or her children is not absolute and has to be balanced against a child's right to have proper parenting:

> A parent's basic constitutional right to the custody and rearing of . . . [his] children is converted, upon the failure to fulfill . . . parental duties, to the children's right to have proper parenting and fulfillment of [the child's] potential in a permanent and healthy, safe environment. There is a recognized connection between Pennsylvania law on termination of parental rights and the Adoption and Safe Families Act . . . This act was designed to curb an inappropriate focus on protecting the rights of parents when there is a risk of subjecting children to long term foster care or returning them to abusive families.

Id. at 478 (citations omitted).

16

## DISCUSSION

First, regarding Father, he has a substantial history of serious mental health concerns and, even with the time he has already served, he will be confined for at least the next 7 ½ years and potentially for the next 23 years. He was convicted of harming X. J. R. and his explanation behind how the injuries occurred was completely incredible. He has not responded to treatment in the past and it is unlikely that it will be safe for any minor children, including X. J. R. and P. A. R., to be in his care at any time during the foreseeable future. He has no bond with X. J. R. or P. A. R. Therefore, the Agency has demonstrated, by clear and convincing evidence, that there is a basis to terminate parental rights in accordance with 23 Pa.C.S. §2511(a)(1),(2) and (5).

Regarding Mother she did make initial efforts regarding the reunification plan. She initially attended visits and participated in several programs to attempt to address her mental health and drug and alcohol concerns. Also, although some concerns still remain regarding her current apartment, her current living arrangement is a substantial improvement over the condition of the home she was residing in February 2014 when X. J. R. and P. A. R. were removed from her physical care. However, very serious concerns still remain.

Mother is still detached from the children during visits. She is also detached from an adequate understanding of her parenting responsibilities. She admits that there is basis to the numerous reports regarding her lack of a nurturing mentality and approach. She asserts that she "can learn to be nurturing," but the record reflects that she has been given the opportunity to address her personal and parenting concerns and she has failed to do so. There is a repeated pattern of Mother failing to follow through with services and

17

requirements and attempting to cover this failure by blaming either the providers of services or those asking her to complete tasks for her lack of action. She refused to continue to attend Alcoholics Anonymous and Narcotics Anonymous meetings because she asserted that there might be individuals at those meetings who would harm her or her children. She did not complete counseling as ordered because she didn't like the counselor she was seeing and "felt like she didn't listen to me." She didn't complete her mental health counseling with Christopher Anderson at the Bradford Regional Medical Center because she didn't feel it was helpful. She didn't take her medication for her seizure disorder and mental health care because she didn't like the side effects and asserted she couldn't afford them even though caseworker Braeger indicated that she could obtain prescription assistance if she contacted the American Red Cross and/or Destinations Bradford.

There is also an unproductive pattern regarding visits. Mother attended some but missed a substantial amount of the scheduled visits. When she was asked to help with the scheduling of the visits she refused to even provide her work schedule. During the visits Mother's care of the children was questionable. She did not understand how to interact and take care of them. She zoned out and looked at her phone. When caseworkers and other service providers attempted to teach Mother to be more attentive and recognize the children's cues, Mother was often very defiant and, again, "she would argue until she was blue in the face."

The case of In re R.M.G., 997 A.2d 339 (Pa.Super. 2010) provides substantial guidance. In that case the trial court accepted a Mother's assertion that, since she had

18

complied with many aspects of the reunification plan and making some progress, the goal should not be changed from reunification to adoption. Mother testified and emphasized that she had completed "classes in anger management, money management, and parenting skills;" and, she had changed her living arrangements. Id. at 344. The Superior Court reversed, holding:

> Because the focus is on the child's best interests, a goal change to adoption might be appropriate, even when a parent substantially complies with a reunification plan. Where a parent's skills, including her judgment with regard to the emotional well being of her children, remain problematic, a goal change to adoption might be appropriate, regardless of the parent's compliance with a permanency plan. The agency is not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided. Thus, even where the parent makes earnest efforts, the court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claim of progress and hope for the future.

Id. at 347 (citations omitted).

The court appreciates Mother's honesty during her testimony when she explained that she was harmed by her own childhood including being molested and being in placement herself. The court accepts Mother's assertion that her reactions and approach as an adult likely developed from events in her history that she had no control over. However, the court has to focus on X.J.R. and P.A.R. regarding this matter. Since the court finds that Mother has been unable to and will continue to be unable to provide proper parental care and control for these children, the court also grants that Agency's request to terminate Mother's Parental Rights.

WHEREFORE, we enter the following:

19

IN THE INTEREST OF:        IN THE COURT OF COMMON PLEAS OF

ADOPTION OF:            McKEAN COUNTY, PENNSYLVANIA

IN RE: P.A.R.             ORPHAN'S COURT DIVISION

                           NO. 42-14-0221


## ORDER


AND NOW, this 30th day of March, 2015, after review of the record and after an evidentiary hearing following due notice, the court makes the following findings and judicial determinations.

1. Petitioner has established a legal basis for terminating the parental rights of the Respondent/Father, H.R., and Respondent/Mother, A.C. to P.A.R., Date of Birth 2014.

2. The following subsection(s) of 23 Pa. C.S.A. §2511(a) establish the basis for terminating the Respondent's parental rights:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

---

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six

20

months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. §2511(a)(1), (2) and (5).

3. Specific findings of fact have been set forth in the Court's Memorandum which is filed contemporaneously with this Order.

It is hereby **ORDERED, ADJUDGED** and **DECREED THAT THE PARENTAL RIGHTS OF** H. R., **NATURAL FATHER; AND,** A.C., **NATURAL MOTHER, TO** P. A. R. , **ARE FOREVER TERMINATED.** Any pending or subsequent adoption of P. A. R. may continue without further notice to or consent of the above mentioned Respondents.

Custody of P. A. R. shall remain with McKean County Children and Youth Services.

**BY THE COURT:**

_____
JOHN H. PAVLOCK, P.J.

Filed March 31, 2015
Clerk of Orphans' Court

21

IN THE INTEREST OF:          IN THE COURT OF COMMON PLEAS OF

ADOPTION OF:                 McKEAN COUNTY, PENNSYLVANIA

IN RE: P.A.R.                ORPHAN'S COURT DIVISION

                             NO. 42-14-0221


**IN THE COURT OF COMMON PLEAS OF McKEAN COUNTY, PENNSYLVANIA
ORPHANS COURT DIVISION**


**In Re: Adoption of**

   P. A · R.

TO:  A · C.

## NOTICE

On March 30TH, 2015, the Court entered a Decree terminating your parental rights to

      P. A · R.                A true and correct copy of that Decree is attached. If you

have any questions about the attached Decree you should immediately contact your

attorney, Daniel Lang, Esq.


You are hereby notified and advised that you have a right to place certain information on file

with these **adoption** proceedings with the Clerk of Courts of McKean County and the

Department of Health or the Department of Welfare. There are two separate rights and they

are set forth in more detail on the two pages that are attached and made a part hereof. The

notice forms are as follows:

1. Notice to Birth Parents--Pennsylvania **Adoption** Medical History Registry.

2. Notice to Birth Parents--**Consent** to the Disclosure of Certain Identifying or Nonidentifying

Information Pertaining to the Birth Parents.


                              BY THE COURT

                              JOHN H. PAVLOCK

                              PRESDIENT JUDGE


22

IN THE INTEREST OF:

ADOPTION OF:

IN RE: P.A.R.

IN THE COURT OF COMMON PLEAS OF

McKEAN COUNTY, PENNSYLVANIA

ORPHAN'S COURT DIVISION

NO. 42-14-0221

**IN THE COURT OF COMMON PLEAS OF McKEAN COUNTY, PENNSYLVANIA
ORPHANS COURT DIVISION**

**In Re: Adoption of**

P. A. R.

TO:  H. R.

## NOTICE

On March 30TH, 2015, the Court entered a Decree terminating your parental rights to
P. A. R.  A true and correct copy of that Decree is attached. If you
have any questions about the attached Decree you should immediately contact your
attorney, Erik Ross, Esq.

You are hereby notified and advised that you have a right to place certain information on file
with these **adoption** proceedings with the Clerk of Courts of McKean County and the
Department of Health or the Department of Welfare. There are two separate rights and they
are set forth in more detail on the two pages that are attached and made a part hereof. The
notice forms are as follows:
1. Notice to Birth Parents--Pennsylvania **Adoption** Medical History Registry.
2. Notice to Birth Parents--**Consent** to the Disclosure of Certain Identifying or Nonidentifying
Information Pertaining to the Birth Parents.

BY THE COURT

JOHN H. PAVLOCK
PRESDIENT JUDGE

23

**Notice to Birth Parents Pennsylvania Adoption Medical History Registry**

This is to inform you about an **adoption** law provision relating to medical history information. As the birth parent of a Pennsylvania born child, who is being or was ever adopted in the past, you have the opportunity to voluntarily place on file medical history information. The information which you choose to provide could be important to your child's present and future medical care needs.

The law makes it possible for you to file current medical information, but it also allows you to update the information as new medically related information becomes available. Requests to release the information will be honored if the request is submitted by a birth child 18 years of age or older. The law also permits that we honor requests for information as submitted by the adoptive parents or legal guardians of adoptees who are not yet 18 years of age. All information will be maintained and distributed in a manner that fully protects your right to privacy.

You may obtain the appropriate form for you to file medical history information by contacting the **Adoption** Medical History Registry. Registry staff are available to answer your questions. Please contact them at:

**Department of Public Welfare**

**Adoption Medical History Registry**

**Hillcrest, Second Floor**

**Post Office Box 2675**

**Harrisburg, Pennsylvania 17105-2675**

**Telephone: 1-800-227-0225**

Medical history information forms may also be obtained locally by contacting one of the following agencies:

1. County Children and Youth Social Service Agency

2. Any private licensed **adoption** agency

3. Any County Court of Common Pleas


**Notice to Birth Parents Right to Consent to the Disclosure of Identifying or Nonidentifying Information Pertaining to the Birth Parents**

This is to inform you about an **adoption** law provision relating to **consent** by you to the disclosure of identifying or nonidentifying information concerning birth parents of a child who has been adopted.

Current Pennsylvania **adoption** laws provide that **adoption** records must be sealed. **Adoption** records can only be opened up by an order of court entered by a judge upon

24

petition of an adopted person supported by cause shown. However, even when the record is opened the court will not reveal any information that would disclose the identity of the birth parents. The identity of birth parents can never be disclosed without their **consent.**

Usually when there is a request for the identification of birth parents the judge will appoint an agency, such as Children & Youth Services, to locate the birth parents to obtain their **consent.** If the birth parents are never located then information concerning the identity of the birth parents will never be disclosed to an adopted person.

The law now makes it possible for you to file a **consent** granting permission for the court or the Department of Health to disclose the information contained in the adopted person's original certificate of birth, or any other identifying or nonidentifying information pertaining to the birth parents. Therefore you may file a **consent** now or at any time hereafter with the Clerk of Courts of McKean County and with the Pennsylvania Department of Health, Bureau of Vital Statistics, to permit the disclosure of this information.

If both birth parents give their **consent** the information on the birth certificate may be disclosed. If only one birth parent gives **consent** only the identity of the consenting parent shall be disclosed. Birth parents are entitled to update those records as necessary to reflect the birth parent's current address or any other information pertaining to the birth parents. Furthermore, if a birth parent gives **consent** that birth parent may later on withdraw that **consent** by filing a withdrawal of **consent** form with the Clerk of Courts and the Pennsylvania Department of Health, Bureau of Vital Statistics.

The Pennsylvania Department of Health has a right to prescribe by regulation the procedure and forms to be utilized for the giving, updating and withdrawal of said **consent.** You should contact an office of the Pennsylvania Department of Health for further information on this.

25

IN THE INTEREST OF:

ADOPTION OF:

IN RE: X.J.R.

IN THE COURT OF COMMON PLEAS OF

McKEAN COUNTY, PENNSYLVANIA

ORPHAN'S COURT DIVISION

NO. 42-14-0221-1

**MEMORANDUM AND ORDER**

X. J. R. is one (1) year old and has a Date of Birth of 2014. Xavier's natural Father is H. R. (hereinafter "Father"); and, his natural Mother is A. C. (hereinafter "Mother"). McKean County Children and Youth Services (hereinafter the "Agency") filed a Petition to Involuntarily Terminate Mother's and Father's Parental Rights and hearing has been held. The matter is now ready for a decision.

**FINDINGS OF FACT:**

X.J.R. has been in placement since February 3, 2014. The court has issued findings regarding the dependency proceedings and those findings are incorporated herein and set forth as follows:

**APRIL 8, 2014, FINDINGS AND ORDER:**

**FINDINGS OF FACT**

Findings of fact are as follows Mother and her counsel stipulate that the child was dependent at the time the Agency filed the within Petition. Father and his counsel stipulate that Father is incarcerated and is likely to remain incarcerated such that Father is not available to care for the child, and therefore, child is dependent The Agency requested and counsel to the parents did not oppose the record remaining open as to the issue of dependency such that the Agency could provide additional testimony in the future should it deem such testimony necessary. The Agency. Mother and her counsel propose and the Master accepts a disposition such that the child shall remain placed in

1
(5)

foster care and Mother shall continue to have routine visits with the child For a two week period, Mother shall have unsupervised visits with the child per a schedule promulgated by the Agency with the Agency conducting unannounced pop-ins during these visits. If the unsupervised visits go well, Mother shall thereafter be afforded overnight visits If the overnight visits go well for a period of two week or more, the Agency will agree to return the child to Mother's care However. Mather is responsible for creating an appropriate child care plan for periods when she is unavailable to care for the child due to work (or any other reason) All caregivers will have to be approved by the Agency Mother must continue to comply with recommended drug and alcohol treatment, as well as recommended mental health treatment, including taking all prescnbed medications in accordance with the prescriptions.

THE COURT FURTHER ORDERS: The child shall remain placed in foster care in the Morrisroe home and Mother shall continue to have routine visits with the child. For a two week period, Mother shall have unsupervised visits with the child per a schedule promulgated by the Agency with the Agency conducting unannounced pop-ins during these visits. If the unsupervised visits go well, Mother shall thereafter be afforded overnight visits. If the overnight visits go well for a period of two weeks or more, the Agency will agree to return the child to Mother's care. However, Mother is responsible for creating an appropriate child care plan for periods when she is unavailable to care for the child due to work (or any other reason) AN caregivers will have to be approved by the Agency Mother must continue to comply with recommended drug and alcohol treatment, as well as recommended mental health treatment, including taking all prescribed medications in accordance with the prescriptions. Both parents shall continue to comply with the Family Service Plan promulgated by the Agency. The record shall remain open as to further reasons for dependency and the Agency shall be permitted to offer additional testimony if such testimony would become necessary it the future
The matter shall be reviewed in one month.

## MAY 6, 2014, FINDINGS AND ORDER:

THE COURT FURTHER FINDS: Counsel stipulates that the sections of the DCRF for this matter containing the information regarding what was ordered to be done at the last hearing and what was done since the last hearing may be admitted into evidence and made a part of the record in this case. The mother was evicted from her last residence and is no longer residing with her boyfriend. Mother is now living with her sister in an apartment

that Mother acknowledges is only appropriate for a temporary period as it is too small to accommodate the child and his twin. Mother is making efforts to find appropriate housing. Mother has not been availing herself of all opportunities for visits with the child and his twin. The mother was not taking seizure medication as prescribed, but she is now involved in treatment again and appears to be taking her seizure medication as prescribed. Mother indicates that her counselor through the 1OP Program is recommending that she attend ANNA meetings upon discharge from 1OP; however, Mother is not comfortable with attending AA/NA meeting and believes it will affect her sobriety if she is forced to attend such meetings. Mother's counsel believes that the recommendation for AA/NA is standard and is not tailored to Mother specifically. Father remains incarcerated and is involved in programming and counseling at the jail. He is disputing the underlying charges which relate to the child and his sibling. The counselor at the jail has apparently indicated that visits with the Father and the child would not be appropriate at this time and the Father may still have bail conditions which would prevent this. The Agency has not been providing Father with much information about the children due to his charges and incarceration.

THE COURT FURTHER ORDERS: The child shall continue to have supervised visits with the Mother per a schedule established by the Agency; however, the Agency shall increase duration and frequency of such visits and only the Mother shall be present for the visits with the supervising CYS representative. Mother shall call for updates during the week from the foster family. The Agency and Mother's counsel shall find out from Mr. Anderson , Director of the !OP Program, if he will agree to Mother having scheduled weekly visits with him in lieu of attending ANNA meetings. Mother shall attend all visits/appointments for the children. The matter shall be reviewed in two months. Mother shall continue her efforts to find appropriate housing and she shall continue to take all medication as prescribed. The Mother shall continue to submit to random drug testing. The Agency shall provide the Father, biweekly written updates on children and their status

## JULY 1, 2014, FINDINGS AND ORDER:

COURT FURTHER FINDS: The foster mother indicates that it isn't her responsibility to contact the Mother and that she would prefer that mother receive information through CYS, although she

3

would communicate with Mother if Ordered to do so. The Mother complains that the foster parents are not calling her back when she leaves messages and that communication with the foster family is difficult. It is apparent that there is a communication breakdown between the Mother and the foster family and that lack of communication may hinder the reunification process if it cannot be remedied. The Mother has been attempting to obtain housing and is working with Tracy Fowler for mental health. The Mother has been referred to blended case management, but has not heard from them. The Mother admittedly did not have a telephone for a period of time so she could not call for updates on the child. She is now working part-time and her schedule normally has her working during the allowed timeframe for her to call the foster home. The Father remains incarcerated and is working on programming while at the jail.

THE COURT **FURTHER** ORDERS: The Mother's request to modify placement is denied at this time; however, she may renew said request if the communication with the foster home does not improve. The Agency shall continue to afford the Mother visit and the Agency shall have the discretion to adjust the location, type and frequency of visits; however, the Mother shall not be granted less than her current visit schedule. The Mother shall call the foster home up to three times per week for updates on the child and may call additionally in the event of an emergency. The Morrisroes shall call the Mother back if she is unable to reach them when she calls. If the Mother's phone is inoperable, she shall notify the Agency/Caseworker immediately. The Mother shall schedule any necessary appointments for the child and shall attend all such visits. The Agency shall continue to provide Father bi-weekly updates on the child's progress and shall hand deliver such updates to the jail. The Mother shall continue to comply with all recommended mental health services and shall maintain her employment. The Mother shall continue her efforts to locate appropriate housing. The Mother shall maintain her sobriety and shall be subjected to random drug screens by the Agency.

The matter shall be reviewed in one month

## AUGUST 5, 2014, FINDINGS AND ORDER:

THE COURT FURTHER FINDS: The Agency requested that the DCRF and both addendums thereto be admitted into evidence;

4

both parents' attorneys objected to certain information in the materials; therefore, the court will accept the DCRF and Addendums into evidence with several caveats: (1) any mention of a positive meth test for the mother shall be stricken, (2) the fact that mother was requested to supply medication information and failed to do so shall remain, (3) the reference to mother applying to social security in the second addendum shall be deleted and replaced with her applying for CHIP, (4) the letters from the paternal grandmother shall be stricken and not considered as she is not a party to the case, and (5) mention of father's criminal charges relating to the child shall be stricken, but it will remain noted that he remains incarcerated. The child has done well in the foster home. The Mother has only called the foster home 55% of the available times. Mother had not contacted the foster home from July 26 to August 4. Mother is currently not taking any of her prescribed medications nor is she following through with services. Father requests that the paternal grandfather be considered for kinship care.

THE COURT FURTHER ORDERS: The Agency shall continue to afford mother supervised visits per the previously set schedule. The Mother must confirm the day before the visit as she has been. The Mother is to follow through with all medications and recommended services and procuring insurance. Mother to continue to contact foster home per previous schedule . If the Mother fails to confirm a visit or confirms but fails to be available/show up for two visits, then the Agency shall request an immediate hearing to discuss reducing the visitation schedule. The mother shall attend all appointments for the child. The Agency to follow through with checking out the kinship request of H. R.

## OCTOBER 7, 2014, FINDINGS AND ORDER:

The Agency is recommending that Mother's and Father's parental rights be terminated and that the children be adopted. Attorney Alfieri-Causer stated that the termination petition would be filed in the near future. If the Petition is denied then the court would immediately schedule a further permanency review hearing and set in place a revised reunification plan. If the petition is granted then the court would direct the Agency to assure that the adoption proceeds in a timely manner. Since it is unknown at this point what the outcome will be the Court is directing the Agency to file the termination petition within the next ten (10) days and directing the

deputy court administrator to schedule a hearing on the termination petitions as soon as the Court's schedule allows.

## ADDITIONAL ORDER:
The Agency shall file their Petitions to Terminate Parental Rights within the next ten (10) days. The Deputy Court Administrator shall schedule hearing on the termination petitions as soon as the Court's schedule allows. Review hearing in this matter shall be held in approximately sixty (60) days.

Based on the testimony and exhibits presented at the time of the termination hearings, the court also finds as follows:

Father has an extensive criminal history and has been sentenced to a lengthy period of incarceration. Specifically, on or about August 21, 2014, Father, H.R. was sentenced at Nos. 314, 315, 316, and 317 CR 2014 for four separate incidents of arson all of which were Felonies in the first degree. The aggregate sentence imposed at those captions was not less than eight-four (84) months nor more than two hundred forty (240) months with credit for time served of one hundred eighty-four (184) days. In addition, on or about August 26, 2014 at No. 156 CR 2014, Father was convicted in a jury trial of Possession with Intent to Deliver a Controlled Substance, a Felony; Endangering the Welfare of a Child, (F-3); Recklessly Endangering Another Person, (M-2); Possession of Small Amount of Marijuana (M); and Simple Assault (M-2). He was sentenced to a total of not less than eighteen (18) nor more than fifty-two (52) months consecutive to all other case numbers. These convictions were as a result of conduct involving X.J.R. On February 1, 2014, Father had placed X.J.R., who was only several weeks old at the time, into scolding hot water. X.J.R. suffered burns to his hands and feet. Father told a CYS investigator that he had "smoked a half joint" just prior to bathing X.J.R.

Father's explanation for how X.J.R. was burned was completely incredible. He explained that he had filled a Tupperware container with water, placed it and X.J.R. on the changing table and "went to talk to my old lady,"

6

and when he came back the child was wet and crying and he noticed burns. However, since the burns were on the hands and feet and X.J.R. was so young, it would be impossible for this infant child to place his hands and feet in hot, scolding water.

When the police investigated the burn incident they also discovered drugs and drug paraphernalia in the Parent's home. The evidence demonstrated that Father was smoking marijuana the day that X.J.R. was injured. Mother was recovering from giving birth to the twins on the day that X.J.R. was injured by Father. However, Mother was also aware that there were narcotics in the home and that Father was smoking marijuana and she still allowed him to provide care for X.J.R. Father's aggregate period of incarceration on both criminal cases is not less than one hundred two (102) months nor more than two hundred ninety two (292) months (8 ½ to 24.3 years).

Father had an extensive psychiatric history prior to February 1, 2014, and had been prescribed medication. Father indicated that he has had "blackouts" in the past. He was not following his treatment plan and taking his medication in February 2014. He advised a CYS interviewer that he wasn't taking his medication because he felt marijuana use was "safer" than his psychiatric medications. Mother was aware that Father had a mental health history and was not taking his medication and she still allowed him to provide care for P.A.R. and X.J.R.

The condition of parent's home on February 1, 2014, was that of complete disarray. There were clothes strewn on the floor and throughout the home, baby items scattered throughout the home, drug paraphernalia out in the open, a cockroach infestation and dirty dishes scattered everywhere. Mother did have a wound from the cesarean section that she had undergone and she was suffering from an infection. Therefore, her ability to maintain the home was limited. However, it was also evident that the home had been in an unsanitary condition for some time. There was no testimony that Mother had recognized the home

7

was unsafe for the children to be in and that she had reached out for assistance. Mother also admitted that she was also smoking marijuana while she was pregnant and residing with Father. Therefore, it is clear that the drug use and the condition of the home wasn't just something that happened when $P.A.R.$ and $X.J.R.$ were born; this was something that had built up over a long period of time. The children were placed in foster care.

Mother initially cooperated with her caseworker and followed the reunification plan. She attended visits and interacted with $P.A.R.$ and $X.J.R.$ She also attended medical appointments. Mother had admitted to her own previous marijuana use but she had obtained a drug and alcohol evaluation and was following her drug and alcohol treatment plan. However, Mother immediately had issues regarding housing. She vacated the home that she and Father had been residing, stayed with friends for some time and was homeless for a period of time.

Mother's initial cooperation with the Agency and progress waned. She refused to continue to attend Alcoholics Anonymous and Narcotics Anonymous meetings because she believed that it would endanger her and her children's lives. However, the court finds no merit to this accretion and the court finds that Mother was inappropriately attempting to use this as an excuse. This bizarre explanation also reflects a pattern that Mother has of attempting to turn positive suggestions into a negative in order to justify her inaction or her opinion – and, as one of her caseworkers described it, "arguing until she is blue in the face." Mother agrees that she did not work well with her initial counselor because she "felt like she didn't listen to me;" and, "because I didn't like her I didn't go (to counseling)." Her case was closed out due to lack of contact. She now has a counselor that she feels listens to her and she has been attending her appointments regularly.

Mother also failed to follow through with her mental health treatment plan. She was seeing Christopher Anderson at the Bradford Regional Medical

8

Center. She was involved in the intensive outpatient program. He prepared an assessment for Mother in March of 2014 and recommended that Mother attend both individual and group therapy sessions. The court accepts his testimony that Mother's sessions had to be "dragged out because she kept missing appointments."[1] Mother was eventually discharged from the program due to noncompliance.

Mother began missing visits and failed to maintain consistent contact with her caseworker. Due to the lack of contact with her P.A.R. i and X.J.R. did not have a strong bond or recognition of Mother and the visits were described as "forced" and "strained." Also, Mother had difficulty emotionally attaching with the boys. She did not understand how to interact with them. If the children were fussy Mother didn't recognize it and did not respond to them. One caseworker describing visits at Mother's apartment stated that "she (Mother) put a movie in and then kind of zoned out on the bed." When caseworkers and other service providers attempted to teach Mother to be more attentive and recognize the children's cues, Mother was often very defiant. Again, a caseworker described it as "she would argue until she was blue in the face." Mother has been referred to services to assist her with development of her parenting abilities. She has participated with some of these services but declined others.

One clear example of Mother's inability to focus on the needs of the children is her frequent use of her cellphone during visits. She won't put it down and is "constantly texting or talking on the phone." These have not been emergency calls. The Court finds that Mother reaches for her phone because she literally can't get into the children's world and she wants to stay in hers – that using her phone is a way to stay in the bubble of her world even when she is with the children.

There were also legitimate concerns regarding Mother leaving the twins in their care seats during visits and not removing their coats, etc. Mother admitted

---

[1] All of the quotes in this opinion are from the court's notes.

that she had done this but asserted that it was appropriate to leave the children strapped in their car seats because it was easier to feed them. She asserted that she is trying to address the Agency's concerns about this. Caseworker Wolfel testified that Mother had extreme difficulty meeting the children's needs during visits. She described one visit where both boys wanted fed and Mother would give them a little to eat, then take the bottle away which would result in that child crying hysterically, she would go to the other child and give him an ounce or two, then back to the other. This resulted in both children crying hysterically and, as caseworker Wolfel described it, "it was not very nice to see." Caseworker Wolfel also testified that Mother was often not ready for visits: "many times we showed up and she was not up."

Mother indicated during her testimony that she understands that she may appear to be not nurturing. She indicated that "it's because of my childhood. I was molested, beat." She explained that she "went from place to place to place as a ward of the state. I didn't know what baby talk is." However, she believed that she could learn to be more nurturing if someone taught it to her.

A clear example of Mother's defiance is her refusal to provide her work schedule to her caseworker and attempt to alter her work schedule so that she could attend visits. Mother works and McDonalds and has been asked to provide her work schedule or change her schedule so that her work does not interfere with her scheduled visits. She has repeatedly failed to provide her work schedule to her caseworker in advance and has repeatedly called at the last minute to advise the Agency that visits would have to be changed due to her work. Mother testified that she didn't understand why her caseworker was asking for her work schedule, "I didn't see the relevance." Another example is Mother's request to have the children removed from the Morrisroe foster home because: "she (Mrs. Morrisroe) was giving me attitude." Mother was also asked to bring toys and other items for visits. She did not dispute that at times she

10

failed to do this but asserted that there are toys at the CYS offices and "why lug three bags."

Mother does have a current apartment that she and her current boyfriend have kept relatively neat and organized (her boyfriend, A. H. , testified that he does a majority of the housework as he is unemployed). However, this apartment is above a bar/restaurant in downtown Bradford, Pennsylvania and it is relatively small. Mother does not have it furnished in a condition that is suitable for the children. Mother's current boyfriend and her 3 year old son are also residing there.

Mother's current boyfriend, A. H. is unemployed. He testified that he has 4 children of his own and the youngest is 9 months old. His two youngest children visit him every other weekend. He has not had any contact with the two older children for years and "my parental rights for my middle child were given up." He testified that he has a medical condition and is "very hard of hearing." He testified, and Mother confirmed, that Mother is suffering from seizures. He explained that "her whole body actually shakes and she can have slight confusion." Mother will shake for 2 or 3 minutes and lose focus and that this happens "1 or 1 ½ times a month." He explained that he is going to stay with Mother and he recognizes when these seizures are coming on. He explained that he does all of the cleaning in the home.

Mother testified that her seizure condition excludes her from obtaining a driver's license. She indicated that her "seizure disorder" started in January of 2012. She believes that she has a "disc that is putting pressure on my brain. About 50% chance that is the cause." When caseworker Stacey Wolfel discovered that Mother was having seizures she had Mother show her all of her prescriptions. It was evident that Mother was not taking her medications and was not attending her mental health appointments. Caseworker Jonathan Braeger testified that Mother also told him that she wasn't taking her seizure and mental health medications. He said that she indicated that she did not like the

11

side effects of her medication and she could not afford them. He told her that she could obtain medication assistance from the American Red Cross and the Destinations Bradford program. However, Mother refused to follow through. Caseworker Braeger repeated a familiar theme: "most of the time we had animosity from her. Very argumentative. She would say that we were wrong."

No medical testimony was presented regarding Mother's seizures or their cause. The court does not accept Mother's assertions that a disc is pushing on her brain; and, even if the court were to accept this assertion, it raises way more serious concerns about Mother's ability to provide future care than is answers. Therefore, a very significant issue remains regarding whether these seizures will stabilize or become worse.

Mother has a pattern of not taking her seizure and mental health medications. Of course, her conditions and symptoms are exasperated if she doesn't take her medication. Since the children would be at serious risk if Mother had a seizure while they were in her care, this raises very serious safety concerns.

P.A.R. and X.J.R. remain in the Morrisroe foster home. Dawn Morrisroe testified that she has been a foster parent for 12 years prior to February 2014. She was initially reluctant to accept further foster children when the Agency contacted her in February 2014. However, since the Agency was having difficulty obtaining an appropriate foster home for P.A.R. she agreed to accept him on a short term basis. Then, when she was told that the Agency was having a hard time finding a foster family willing to accept X.J.R., she agreed to accept him as well. She also did not want these twin boys to be separated. It has been demanding to provide care for the twins but she has become very bonded to them and they are very bonded with her and her family. She has attended the majority of their medical appointments and is working with service providers regarding the children's needs.

12

Mrs. Morrisroe initially agreed to provide care for the twins because she believed that Mother had indicated a desire to work with her, the Agency and service providers to have the children returned to her care. However, after initial progress Mrs. Morrisroe became frustrated with Mother's lack of progress and initiative. Doctor's appointments were scheduled only to be cancelled, at the doctor's office, when Mother failed to show up. She would make suggestions to Mother about providing care, such as not to put cereal in the children's bottles as they were too young for it and it was not recommended by their doctor, and Mother would not only ignore her but defiantly argue with her. After the children were in placement for about 6 months Mother became very frustrated with Mrs. Morrisroe and Mrs. Morrisroe became very frustrated with Mother. Mother then, instead of focusing on improving her parental skills, focused on constantly questioning Mrs. Morrisroe's care for the boys and asserting that both Mrs. Morrisroe and the Agency were in a conspiracy against her.

P.A.R. and X.J.R. are extremely bonded to Mrs. Morrisroe. She indicated that she will adopt both of them if that is an option, even if her husband is unwilling to do so. She explained that her husband is close to the boys and provides care for them but he is not certain that he wants to take on full parental responsibilities for them. Mrs. Morrisroe testified that, even if her husband is unwilling to adopt P.A.R. and X.J.R. she will. She very bluntly indicated that her desire to care for P.A.R. and X.J.R. will trump all other responsibilities and interests in her life.

13

## AUTHORITY:

The Agency asserts that the following statutory requirements for termination of parental rights have been demonstrated in this case:

> **(a) General rule.** -- The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ---
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. §2511(a)(1),(2) and (5).

The grounds for terminating parental rights under Section 2511(a)(2) are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. In re A.L.D., 797 A.2d 326, 337 (Pa.Super. 2002). Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. Id. at 340.

> In In re Geiger, 459 Pa. 636, 331 A.2d 172 (1975), our Supreme Court first announced the fundamental test in terminating parental rights

14

pursuant to section 2511(a)(2). According to <u>Geiger</u>, three things must be shown before a natural parent's rights in a child will be terminated: (1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. <u>Id.</u> at 173-174.

In Re R.H., 33 A.2d 95, 100 (Pa.Super. 2011). In <u>R.H.</u> the Superior Court focused on the following factors when it upheld the trial court's termination of parental rights: parent was "minimally compliant" but she still failed to grasp and implement proper parenting skills; she was argumentative with service providers and her caseworkers; and, her participation was consistently "erratic" and without reasonable prospect of change. <u>Id.</u> at 102-103.

When addressing a request to terminate parental rights the Court is required to "[g]ive primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.C. §2511(b). Further, "[t]he rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. <u>Id.</u>

An inquiry into whether termination of parental rights would best serve the developmental, physical and emotional needs and welfare of the child is a distinct aspect of a termination hearing, to be undertaken only after the statutory requirements of section 2511(a) have been met. Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of a child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect

15

on the child of permanently severing the bond. In re C.P., 901 A.2d 516, 520 (Pa.Super.

2006), as cited by, In re K.C.F., 928 A.2d 1046, 1049 (Pa.Super. 2007).

The burden of proof upon a petitioner in a termination proceeding is by clear and

convincing evidence:

> In termination cases, the burden is upon the petitioner to prove by clear
> and convincing evidence that the asserted grounds for seeking termination
> of parental rights are valid. . . . The standard of clear and convincing
> evidence is defined as testimony that is so 'clear, direct, weighty and
> convincing as to enable the trier of fact to come to a clear conviction,
> without hesitance, of the truth of the precise facts in issue.'

In the Interest of A.S., 11 A.3d 473, 477 (2010)(citations omitted).

When reviewing the evidence the Court, as the trier of fact, "is likewise free to

make all credibility determinations and resolve conflicts in the evidence." Id.

A parent's right to the custody of his or her children is not absolute and has to be

balanced against a child's right to have proper parenting:

> A parent's basic constitutional right to the custody and rearing of . . .
> [his] children is converted, upon the failure to fulfill . . . parental duties, to
> the children's right to have proper parenting and fulfillment of [the
> child's] potential in a permanent and healthy, safe environment. There is a
> recognized connection between Pennsylvania law on termination of
> parental rights and the Adoption and Safe Families Act . . . This act was
> designed to curb an inappropriate focus on protecting the rights of parents
> when there is a risk of subjecting children to long term foster care or
> returning them to abusive families.

Id. at 478 (citations omitted).

16

## DISCUSSION

First, regarding Father, he has a substantial history of serious mental health concerns and, even with the time he has already served, he will be confined for at least the next 7 ½ years and potentially for the next 23 years. He was convicted of harming X.J.R. and his explanation behind how the injuries occurred was completely incredible. He has not responded to treatment in the past and it is unlikely that it will be safe for any minor children, including X.J.R. and P.A.R. to be in his care at any time during the foreseeable future. He has no bond with X.J.R. or P.A.R. Therefore, the Agency has demonstrated, by clear and convincing evidence, that there is a basis to terminate parental rights in accordance with 23 Pa.C.S. §2511(a)(1),(2) and (5).

Regarding Mother, she did make initial efforts regarding the reunification plan. She initially attended visits and participated in several programs to attempt to address her mental health and drug and alcohol concerns. Also, although some concerns still remain regarding her current apartment, her current living arrangement is a substantial improvement over the condition of the home she was residing in February 2014 when X.J.R. and P.A.R. were removed from her physical care. However, very serious concerns still remain.

Mother is still detached from the children during visits. She is also detached from an adequate understanding of her parenting responsibilities. She admits that there is basis to the numerous reports regarding her lack of a nurturing mentality and approach. She asserts that she "can learn to be nurturing," but the record reflects that she has been given the opportunity to address her personal and parenting concerns and she has failed to do so. There is a repeated pattern of Mother failing to follow through with services and

17

requirements and attempting to cover this failure by blaming either the providers of services or those asking her to complete tasks for her lack of action. She refused to continue to attend Alcoholics Anonymous and Narcotics Anonymous meetings because she asserted that there might be individuals at those meetings who would harm her or her children. She did not complete counseling as ordered because she didn't like the counselor she was seeing and "felt like she didn't listen to me." She didn't complete her mental health counseling with Christopher Anderson at the Bradford Regional Medical Center because she didn't feel it was helpful. She didn't take her medication for her seizure disorder and mental health care because she didn't like the side effects and asserted she couldn't afford them even though caseworker Braeger indicated that she could obtain prescription assistance if she contacted the American Red Cross and/or Destinations Bradford.

There is also an unproductive pattern regarding visits. Mother attended some but missed a substantial amount of the scheduled visits. When she was asked to help with the scheduling of the visits she refused to even provide her work schedule. During the visits Mother's care of the children was questionable. She did not understand how to interact and take care of them. She zoned out and looked at her phone. When caseworkers and other service providers attempted to teach Mother to be more attentive and recognize the children's cues, Mother was often very defiant and, again, "she would argue until she was blue in the face."

The case of In re R.M.G., 997 A.2d 339 (Pa.Super. 2010) provides substantial guidance. In that case the trial court accepted a Mother's assertion that, since she had

18

complied with many aspects of the reunification plan and making some progress, the goal should not be changed from reunification to adoption. Mother testified and emphasized that she had completed "classes in anger management, money management, and parenting skills;" and, she had changed her living arrangements. Id. at 344. The Superior Court reversed, holding:

> Because the focus is on the child's best interests, a goal change to adoption might be appropriate, even when a parent substantially complies with a reunification plan. Where a parent's skills, including her judgment with regard to the emotional well being of her children, remain problematic, a goal change to adoption might be appropriate, regardless of the parent's compliance with a permanency plan. The agency is not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided. Thus, even where the parent makes earnest efforts, the court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claim of progress and hope for the future.

Id. at 347 (citations omitted).

The court appreciates Mother's honesty during her testimony when she explained that she was harmed by her own childhood including being molested and being in placement herself. The court accepts Mother's assertion that her reactions and approach as an adult likely developed from events in her history that she had no control over. However, the court has to focus on X.J.R. and P.A.R. regarding this matter. Since the court finds that Mother has been unable to and will continue to be unable to provide proper parental care and control for these children, the court also grants that Agency's request to terminate Mother's Parental Rights.

WHEREFORE, we enter the following:

19

| | |
|---|---|
| IN THE INTEREST OF: | IN THE COURT OF COMMON PLEAS OF |
| ADOPTION OF: | McKEAN COUNTY, PENNSYLVANIA |
| IN RE: X.J.R | ORPHAN'S COURT DIVISION |
| | NO. 42-14-0221-1 |

**ORDER**

**AND NOW**, this 30th day of March, 2015, after review of the record and after an evidentiary hearing following due notice, the court makes the following findings and judicial determinations.

1. Petitioner has established a legal basis for terminating the parental rights of the Respondent/Father, H.R. , and Respondent/Mother, A.C. to X.J.R. Date of Birth 2014.

2. The following subsection(s) of 23 Pa. C.S.A. §2511(a) establish the basis for terminating the Respondent's parental rights:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

---

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six

20

months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. §2511(a)(1), (2) and (5).

3. Specific findings of fact have been set forth in the Court's Memorandum which is filed contemporaneously with this Order.

It is hereby **ORDERED, ADJUDGED** and **DECREED THAT THE PARENTAL RIGHTS OF** H.R., **NATURAL FATHER; AND,** A.C., **, NATURAL MOTHER, TO** X.J.R., **ARE FOREVER TERMINATED**. Any pending or subsequent adoption of X.J.R. may continue without further notice to or consent of the above mentioned Respondents.

Custody of X.J.R. shall remain with McKean County Children and Youth Services.

**BY THE COURT:**

JOHN H. PAVLOCK, P.J.

Filed March 31, 2015
Clerk of Orphans' Court

21

IN THE INTEREST OF:          IN THE COURT OF COMMON PLEAS OF

ADOPTION OF:                 McKEAN COUNTY, PENNSYLVANIA

IN RE: X.J.R.                ORPHAN'S COURT DIVISION

                             NO. 42-14-0221-1


IN THE COURT OF COMMON PLEAS OF McKEAN COUNTY, PENNSYLVANIA
ORPHANS COURT DIVISION


**In Re: Adoption of**

   X. J. R.


TO:   A. C.

## NOTICE

On March 30TH, 2015, the Court entered a Decree terminating your parental rights to

   X . J. R .          A true and correct copy of that Decree is attached. If you have any questions about the attached Decree you should immediately contact your attorney, Daniel Lang, Esq.


You are hereby notified and advised that you have a right to place certain information on file with these **adoption** proceedings with the Clerk of Courts of McKean County and the Department of Health or the Department of Welfare. There are two separate rights and they are set forth in more detail on the two pages that are attached and made a part hereof. The notice forms are as follows:

1. Notice to Birth Parents--Pennsylvania **Adoption** Medical History Registry.
2. Notice to Birth Parents--**Consent** to the Disclosure of Certain Identifying or Nonidentifying Information Pertaining to the Birth Parents.


                                   BY THE COURT

                                   JOHN H. PAVLOCK
                                   PRESDIENT JUDGE


22

IN THE INTEREST OF:

ADOPTION OF:

IN RE: X.J.R.

IN THE COURT OF COMMON PLEAS OF

McKEAN COUNTY, PENNSYLVANIA

ORPHAN'S COURT DIVISION

NO. 42-14-0221-1

IN THE COURT OF COMMON PLEAS OF McKEAN COUNTY, PENNSYLVANIA
ORPHANS COURT DIVISION

In Re: Adoption of

X. J. R.

TO: H. R.

## NOTICE

On March 30TH, 2015, the Court entered a Decree terminating your parental rights to X. J. R. A true and correct copy of that Decree is attached. If you have any questions about the attached Decree you should immediately contact your attorney, Erik Ross, Esq.

You are hereby notified and advised that you have a right to place certain information on file with these **adoption** proceedings with the Clerk of Courts of McKean County and the Department of Health or the Department of Welfare. There are two separate rights and they are set forth in more detail on the two pages that are attached and made a part hereof. The notice forms are as follows:

1. Notice to Birth Parents--Pennsylvania **Adoption** Medical History Registry.

2. Notice to Birth Parents--**Consent** to the Disclosure of Certain Identifying or Nonidentifying Information Pertaining to the Birth Parents.

BY THE COURT

JOHN H. PAVLOCK
PRESDIENT JUDGE

23

**Notice to Birth Parents Pennsylvania Adoption Medical History Registry**

This is to inform you about an adoption law provision relating to medical history information. As the birth parent of a Pennsylvania born child, who is being or was ever adopted in the past, you have the opportunity to voluntarily place on file medical history information. The information which you choose to provide could be important to your child's present and future medical care needs.

The law makes it possible for you to file current medical information, but it also allows you to update the information as new medically related information becomes available. Requests to release the information will be honored if the request is submitted by a birth child 18 years of age or older. The law also permits that we honor requests for information as submitted by the adoptive parents or legal guardians of adoptees who are not yet 18 years of age. All information will be maintained and distributed in a manner that fully protects your right to privacy.

You may obtain the appropriate form for you to file medical history information by contacting the **Adoption** Medical History Registry. Registry staff are available to answer your questions. Please contact them at:

**Department of Public Welfare**

**Adoption Medical History Registry**

**Hillcrest, Second Floor**

**Post Office Box 2675**

**Harrisburg, Pennsylvania 17105-2675**

**Telephone: 1-800-227-0225**

Medical history information forms may also be obtained locally by contacting one of the following agencies:

1. County Children and Youth Social Service Agency

2. Any private licensed **adoption** agency

3. Any County Court of Common Pleas


**Notice to Birth Parents Right to Consent to the Disclosure of Identifying or Nonidentifying Information Pertaining to the Birth Parents**

This is to inform you about an adoption law provision relating to **consent** by you to the disclosure of identifying or nonidentifying information concerning birth parents of a child who has been adopted.

Current Pennsylvania **adoption** laws provide that **adoption** records must be sealed. **Adoption** records can only be opened up by an order of court entered by a judge upon petition of an adopted person supported by cause shown. However, even when the record is opened the court will not reveal any information that would disclose the identity of the birth parents. The identity of birth parents can never be disclosed without their **consent.**

Usually when there is a request for the identification of birth parents the judge will appoint an agency, such as Children & Youth Services, to locate the birth parents to obtain their **consent.** If the birth parents are never located then information concerning the identity of the birth parents will never be disclosed to an adopted person.

The law now makes it possible for you to file a **consent** granting permission for the court or the Department of Health to disclose the information contained in the adopted person's original certificate of birth, or any other identifying or nonidentifying information pertaining to the birth parents. Therefore you may file a **consent** now or at any time hereafter with the Clerk of Courts of McKean County and with the Pennsylvania Department of Health, Bureau of Vital Statistics, to permit the disclosure of this information.

If both birth parents give their **consent** the information on the birth certificate may be disclosed. If only one birth parent gives **consent** only the identity of the consenting parent shall be disclosed. Birth parents are entitled to update those records as necessary to reflect the birth parent's current address or any other information pertaining to the birth parents. Furthermore, if a birth parent gives **consent** that birth parent may later on withdraw that **consent** by filing a withdrawal of **consent** form with the Clerk of Courts and the Pennsylvania Department of Health, Bureau of Vital Statistics.

The Pennsylvania Department of Health has a right to prescribe by regulation the procedure and forms to be utilized for the giving, updating and withdrawal of said **consent.** You should contact an office of the Pennsylvania Department of Health for further information on this.